[864 NE2d 1272, 832 NYS2d 873]

Louis E. Thyroff, Appellant, v Nationwide Mutual Insurance Company et al., Respondents.

Argued February 15, 2007; decided March 22, 2007

### POINTS OF COUNSEL

*William P. Tedards, Jr.*, of the District of Columbia bar, admitted pro hac vice, and *Finucane and Hartzell, LLP*, Pittsford (*Leo G. Finucane* of counsel), for appellant. Electronic documents are "documents" for purposes of conversion analysis. (*Kremen v Cohen*, 337 F3d 1024; *Pierpoint v Hoyt*, 260 NY 26; *Agar v Orda*, 264 NY 248; *Iglesias v United States*, 848 F2d 362; *Ippolito v Lennon*, 150 AD2d 300; *Astroworks, Inc. v Astroexhibit, Inc.*, 257 F Supp 2d 609; *Manufacturers Hanover Trust Co. v Chemical Bank*, 160 AD2d 113; *Shmueli v Corcoran Group*, 9 Misc 3d 589.)

*Bingham McCutchen LLP*, Hartford, Connecticut (*Ben M. Krowicki* of counsel), for respondents. I. New York common law does not recognize a claim for conversion of an intangible such as electronic data. (*Industrial & Gen. Trust, Ltd. v Tod*, 170 NY 233; *Employers' Fire Ins. Co. v Cotten*, 245 NY 102; *Hart v City of Albany*, 272 AD2d 668; *Agar v Orda*, 264 NY 248; *Pierpoint v Hoyt*, 260 NY 26; *Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.*, 87 NY2d 36; *Sporn v MCA Records*, 58 NY2d 482; *MBF Clearing Corp. v Shine*, 212 AD2d 478; *Ippolito v Lennon*, 150 AD2d 300; *Rao v Verde*, 222 AD2d 569.) II. New York common law should not be rewritten to encompass intangible electronic data on this appeal. (*Madden v Creative Servs.*, 84 NY2d 738; *Hurst v Dezer/Reyes Corp.*, 82 F3d 232; *MetLife Auto & Home v Joe Basil Chevrolet*, 1 NY3d 478; *Laurent v Williamsburgh Sav. Bank*, 28 Misc 2d 140; *Nadel v Play-By-Play Toys & Novelties, Inc.*, 208 F3d 368; *Meyer v Guinta*, 262 AD2d 463; *1455 Washington Ave. Assoc. v Rose & Kiernan*, 260 AD2d 770; *Trulock v Freeh*, 275 F3d 391; *Trombetta v Conkling*, 82 NY2d 549; *Hartford Acc. & Indem. Co. v Walston & Co.*, 21 NY2d 219.)

### OPINION OF THE COURT

Graffeo, J.

The United States Court of Appeals for the Second Circuit has certified a question to us that asks whether the common-law cause of action of conversion applies to certain electronic computer records and data. Based on the facts of this case, we hold that plaintiff may maintain a conversion claim.

### I

Plaintiff Louis Thyroff was an insurance agent for defendant Nationwide Mutual Insurance Company. In 1988, the parties

had entered into an Agent's Agreement that specified the terms of their business relationship. As part of the arrangement, Nationwide agreed to lease Thyroff computer hardware and software, referred to as the agency office-automation (AOA) system, to facilitate the collection and transfer of customer information to Nationwide. In addition to the entry of business data, Thyroff also used the AOA system for personal e-mails, correspondence and other data storage that pertained to his customers. On a daily basis, Nationwide would automatically upload all of the information from Thyroff's AOA system, including Thryoff's personal data, to its centralized computers.

The Agent's Agreement was terminable at will and, in September 2000, Thyroff received a letter from Nationwide informing him that his contract as an exclusive agent had been cancelled. The next day, Nationwide repossessed its AOA system and denied Thyroff further access to the computers and all electronic records and data. Consequently, Thyroff was unable to retrieve his customer information and other personal information that was stored on the computers.

Thyroff initiated an action against Nationwide in the United States District Court for the Western District of New York, asserting several causes of action, including a claim for the conversion of his business and personal information stored on the computer hard drives. In response to Nationwide's motion to dismiss, District Court held that the complaint failed to state a cause of action for conversion because Thyroff did not allege that Nationwide exercised dominion over the electronic data to his exclusion and it was undisputed that Nationwide owned the AOA system.[1]

In his appeal to the United States Court of Appeals for the Second Circuit, Thyroff sought reinstatement of his conversion cause of action, along with other relief. Nationwide countered that a conversion claim cannot be based on the misappropriation of electronic records and data because New York does not recognize a cause of action for the conversion of intangible property. The Second Circuit determined that the issue was unresolved in New York and therefore certified the following

---

1. The District Court dismissed 11 other causes of action set forth in the complaint. The court subsequently granted Nationwide partial summary judgment dismissing a claim of breach of contract to the extent it was premised on the AOA system lease.

question of law to this Court: is a claim for the conversion of electronic data cognizable under New York law?[2]

## II

"The hand of history lies heavy upon the tort of conversion" (Prosser, *The Nature of Conversion*, 42 Cornell LQ 168, 169 [1957]). The "ancient doctrine" has gone through a great deal of evolution over time (Franks, *Analyzing the Urge to Merge: Conversion of Intangible Property and the Merger Doctrine in the Wake of Kremen v. Cohen*, 42 Hous L Rev 489, 495 and n 32 [Summer 2005]), dating back to the Norman Conquest of England in 1066 (*see* Ames, *The History of Trover*, 11 Harv L Rev 277, 278 [1897] [hereinafter Ames]).

Before the English royal government undertook the prosecution of crime, redress for the tortious or criminal misappropriation of chattels was limited to private actions, such as "the recuperatory appeals of robbery or larceny" available to persons whose property had been stolen (*id.* at 278).[3] In general, these appeals took two forms. If a thief was immediately apprehended while in possession of the stolen goods, the wrongdoer "was straightaway put to death [by the court], without a hearing, and the [victim] recovered his goods" (*id.*). In other cases, rightful ownership of the property was usually determined by a "wager of battle"—a physical altercation or duel between the victim and the thief (*see* Black's Law Dictionary 1544 [8th ed 2004]), with the victor taking title to the goods (*see* Ames, 11 Harv L Rev at 279). Because this "remedy" could lead to a thief killing or maiming the chattel's owner and taking legal ownership of the stolen property, it was "widely detested" by the populace (Black's Law Dictionary 1544).

Over time, the practice of trial by jury was instituted and wager of battle steadily lost favor (*see* Ames, 11 Harv L Rev at

---

**2.** The Second Circuit also extended an opportunity for us to determine who is the proper owner of the electronic information at issue. Because Thyroff's conversion claim was dismissed pursuant to Federal Rules of Civil Procedure rule 12 (b) (6) and a reviewing court must construe all facts and inferences in Thyroff's favor, we presume that he is the owner of the data for the purpose of resolving the certified question.

**3.** There were also "punitory appeals," which, as the name connotes, were utilized solely for punishing thieves in situations where property stolen was of a certain value and could not be recovered (Ames, 11 Harv L Rev at 278).

279-280).[4] Contributing to its demise at the end of the 12th century was the advent of criminal prosecutions by the Crown. But successful prosecution by the government could result in forfeiture of the stolen chattels to the King rather than the return of property to its rightful owner—an unwelcome prospect for the victim of a theft.

The appeals of robbery and larceny also failed to provide an adequate remedy because a victim could not seek monetary damages from the thief—the only remedy was return of the stolen property. By 1252, a new cause of action—*trespass de bonis asportatis*[5]—was introduced. It allowed a plaintiff to obtain pecuniary damages for certain misappropriations of property and, following a favorable jury verdict, the sale of the defendant's property to pay a plaintiff the value of the stolen goods.[6] If, however, the defendant offered to return the property to its rightful owner, the owner had to accept it and "recovery was limited to the damages he had sustained through his loss of possession, or through harm to the chattel, which were usually considerably less than its value" (Prosser, *The Nature of Conversion*, 42 Cornell LQ at 170).

In the late 15th century, the common law was extended to "fill the gap left by the action of trespass" (Prosser and Keeton, Torts § 15, at 89 [5th ed]) by providing a more comprehensive remedy in cases where a defendant's interference with property rights was so serious that it went beyond mere trespass to a conversion of the property (*see* Prosser, 42 Cornell LQ at 169). Known as "trover," this cause of action was aimed at a person who had found goods and refused to return them to the title owner, and was premised on the theory that:

> "the defendant, by 'converting' the chattel to his own use, had appropriated the plaintiff's rights, for which he was required to make compensation. The plaintiff was therefore not required to accept the chattel when it was tendered back to him; and he recovered as his damages the full value of the chattel at the time and place of the conversion. . . . The

---

4.  Wager of battle was not formally abolished in England until 1818 (*see* Black's Law Dictionary 1544).

5.  A Latin phrase meaning "trespass for carrying goods away" (Black's Law Dictionary 1542).

6.  "Detinue," a related cause of action, provided a similar remedy for the improper detention (as opposed to taking) of property (*see* Ames, 11 Harv L Rev at 375).

effect was that the defendant was compelled, because of his wrongful appropriation, to buy the chattel at a forced sale, of which the action of trover was the judicial instrument" (*id.* at 170).

An action for trover originally could not be invoked by a person who did not lose personal property or have a right to immediate possession of the property (*see* Restatement [Second] of Torts § 222A, Comments *a*, *b*; Ames, 11 Harv L Rev at 277). Because of the advantages that trover afforded over older forms of relief, its use was stretched to cover additional misappropriations, including thefts (*see* Prosser, 42 Cornell LQ at 169; Restatement [Second] of Torts § 222A, Comment *a*).

Trover gave way slowly to the tort of conversion, which was created to address "some interferences with chattels for which the action of trover would not lie," such as a claim dealing with a right of future possession (Restatement [Second] of Torts § 222A, Comment *b*). The technical differences between trover and conversion eventually disappeared. The Restatement (Second) of Torts now defines conversion as an intentional act of "dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel" (*id.* § 222A [1]).

### III

As history reveals, the common law has evolved to broaden the remedies available for the misappropriation of personal property. As the concept of summary execution and wager of battle became incompatible with emerging societal values, the law changed. Similarly, the courts became willing to consider new species of personal property eligible for conversion actions.

Conversion and its common-law antecedents were directed against interferences with or misappropriation of "goods" that were tangible, personal property. This was consistent with the original notions associated with the appeals of robbery and larceny, trespass and trover because tangible property could be lost or stolen (*see* Prosser and Keeton, Torts § 15, at 90). By contrast, real property and all manner of intangible rights could not be "lost or found" in the eyes of the law and were not therefore subject to an action for trover or conversion (*see id.* at 91).

Under this traditional construct, conversion was viewed as "the 'unauthorized assumption and exercise of the right of

ownership over goods belonging to another to the exclusion of the owner's rights' " (*State of New York v Seventh Regiment Fund*, 98 NY2d 249, 259 [2002], quoting *Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.*, 87 NY2d 36, 44 [1995]; *see e.g. Colavito v New York Organ Donor Network, Inc.*, 8 NY3d 43, 49-50 [2006]; *Industrial & Gen. Trust, Ltd. v Tod*, 170 NY 233, 245 [1902]). Thus, the general rule was that "an action for conversion will not normally lie, when it involves intangible property" because there is no physical item that can be misappropriated (*Sporn v MCA Records*, 58 NY2d 482, 489 [1983]).

Despite this long-standing reluctance to expand conversion beyond the realm of tangible property, some courts determined that there was "no good reason for keeping up a distinction that arose wholly from that original peculiarity of the action" of trover (that an item had to be capable of being lost and found) and substituted a theory of conversion that covered "things represented by valuable papers, such as certificates of stock, promissory notes, and other papers of value" (*Ayres v French*, 41 Conn 142, 150, 151 [1874]). This, in turn, led to the recognition that an intangible property right can be united with a tangible object for conversion purposes (*see Agar v Orda*, 264 NY 248, 251 [1934]; *Iglesias v United States*, 848 F2d 362, 364 [2d Cir 1988]).

In *Agar*, which involved the conversion of intangible shares of stock, this Court applied the so-called "merger" doctrine because:

> "for practical purposes [the shares] are merged in stock certificates which are instrumentalities of trade and commerce. . . . Such certificates 'are treated by business men as property for all practical purposes.' . . . Indeed, this court has held that the shares of stock are so completely merged in the certificate that conversion of the certificate may be treated as a conversion of the shares of stock represented by the certificate" (264 NY at 251; *see also Pierpoint v Hoyt*, 260 NY 26, 28-29 [1932]).

More recently, we concluded that a plaintiff could maintain a cause of action for conversion where the defendant infringed on the plaintiff's intangible property right to a musical performance by misappropriating a master recording—a tangible item

of property capable of being physically taken (*see Sporn v MCA Records*, 58 NY2d at 489).[7]

## IV

We have not previously had occasion to consider whether the common law should permit conversion for intangible property interests that do not strictly satisfy the merger test. Although some courts have adhered to the traditional rules of conversion (*see e.g. Allied Inv. Corp. v Jasen*, 354 Md 547, 562, 731 A2d 957, 965 [1999] [interests in partnership and corporation]; *Northeast Coating Tech., Inc. v Vacuum Metallurgical Co., Ltd.*, 684 A2d 1322, 1324 [Me 1996] [interest in information contained in prospectus]; *Montecalvo v Mandarelli*, 682 A2d 918, 929 [RI 1996] [partnership interest]), others have taken a more flexible view of conversion and held that the cause of action can embrace intangible property (*see e.g. Kremen v Cohen*, 337 F3d 1024, 1033-1034 [9th Cir 2003] [Internet domain name; applying California law]; *Shmueli v Corcoran Group*, 9 Misc 3d 589, 594 [Sup Ct, NY County 2005] [computerized client/investor list]; *see generally Town & Country Props., Inc. v Riggins*, 249 Va 387, 396-397, 457 SE2d 356, 363-364 [1995] [person's name]).[8]

A variety of arguments have been made in support of expanding the scope of conversion. Some courts have decided that a theft of intangible property is a violation of the criminal law and should be civilly remediable (*see National Sur. Corp. v Ap-*

---

**7.** The Restatement (Second) of Torts reflects the "merger" theory as follows:

> "(1) Where there is conversion of a document in which intangible rights are merged, the damages include the value of such rights.
> "(2) One who effectively prevents the exercise of intangible rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted" (Restatement [Second] of Torts § 242).

**8.** At least one court has approved of the use of conversion by referencing the merger doctrine (*see e.g. Astroworks, Inc. v Astroexhibit, Inc.*, 257 F Supp 2d 609, 618 [SD NY 2003] [conversion of idea that was represented by an Internet Web site]). Conversion claims have also been approved without consideration of the historical limits of the cause of action (*see e.g. Cole v Control Data Corp.*, 947 F2d 313, 318 [8th Cir 1991] [computer software program]; *Quincy Cablesystems, Inc. v Sully's Bar, Inc.*, 650 F Supp 838, 848 [D Mass 1986] [satellite cable signals]; *Charter Hosp. of Mobile, Inc. v Weinberg*, 558 So 2d 909, 912 [Ala 1990] [addiction treatment program]; *National Sur. Corp. v Applied Sys., Inc.*, 418 So 2d 847, 850 [Ala 1982] [computer program]; *Mundy v Decker*, 1999 WL 14479, *4, 1999 Neb App LEXIS 3, *10-12 [Ct App 1999] [WordPerfect documents]).

*plied Sys., Inc.*, 418 So 2d at 850); that virtual documents can be made tangible "by the mere expedient of a printing key function" (*Shmueli v Corcoran Group*, 9 Misc 3d at 592); that a writing is a document whether it is read on the computer or printed on paper (*see Kremen v Cohen*, 325 F3d 1035, 1048 [9th Cir 2003, Kozinski, J., dissenting from certification]); and that the expense of creating intangible, computerized information should be counterbalanced by the protection of an effective civil action (*see National Sur. Corp. v Applied Sys., Inc.*, 418 So 2d at 850).

On the other hand, the primary argument for retaining the traditional boundaries of the tort is that it "seem[s] preferable to fashion other remedies, such as unfair competition, to protect people from having intangible values used and appropriated in unfair ways" (Prosser and Keeton, Torts § 15, at 92). Nonetheless, advocates of this view readily concede that "[t]here is perhaps no very valid and essential reason why there might not be conversion of" intangible property (*id.* at 92) and that there is "very little practical importance whether the tort is called conversion, or a similar tort with another name" because "[i]n either case the recovery is for the full value of the intangible right so appropriated" (Restatement [Second] of Torts § 242, Comment *e*). The lack of a compelling reason to prohibit conversion for redress of a misappropriation of intangible property underscores the need for reevaluating the appropriate application of conversion.

## V

"[I]t is the strength of the common law to respond, albeit cautiously and intelligently, to the demands of commonsense justice in an evolving society" (*Madden v Creative Servs.*, 84 NY2d 738, 744 [1995]; *see Hymowitz v Eli Lilly & Co.*, 73 NY2d 487, 507 [1989], *cert denied* 493 US 944 [1989]). That time has arrived. The reasons for creating the merger doctrine and departing from the strict common-law limitation of conversion inform our analysis. The expansion of conversion to encompass a different class of property, such as shares of stock, was motivated by "society's growing dependence on intangibles" (Franks, *Analyzing the Urge to Merge: Conversion of Intangible Property and the Merger Doctrine in the Wake of Kremen v. Cohen*, 42 Hous L Rev at 498). It cannot be seriously disputed that society's reliance on computers and electronic data is substantial, if not essential. Computers and digital information are

ubiquitous and pervade all aspects of business, financial and personal communication activities. Indeed, this opinion was drafted in electronic form, stored in a computer's memory and disseminated to the Judges of this Court via e-mail. We cannot conceive of any reason in law or logic why this process of virtual creation should be treated any differently from production by pen on paper or quill on parchment. A document stored on a computer hard drive has the same value as a paper document kept in a file cabinet.

The merger rule reflected the concept that intangible property interests could be converted only by exercising dominion over the paper document that represented that interest (*see Pierpoint v Hoyt*, 260 NY at 29). Now, however, it is customary that stock ownership exclusively exists in electronic format. Because shares of stock can be transferred by mere computer entries, a thief can use a computer to access a person's financial accounts and transfer the shares to an account controlled by the thief. Similarly, electronic documents and records stored on a computer can also be converted by simply pressing the delete button (*cf. Kremen v Cohen*, 337 F3d at 1034 ["It would be a curious jurisprudence that turned on the existence of a paper document rather than an electronic one. Torching a company's file room would then be conversion while hacking into its mainframe and deleting its data would not" (emphasis omitted)]).

Furthermore, it generally is not the physical nature of a document that determines its worth, it is the information memorialized in the document that has intrinsic value. A manuscript of a novel has the same value whether it is saved in a computer's memory or printed on paper. So too, the information that Thyroff allegedly stored on his leased computers in the form of electronic records of customer contacts and related data has value to him regardless of whether the format in which the information was stored was tangible or intangible. In the absence of a significant difference in the value of the information, the protections of the law should apply equally to both forms—physical and virtual.

In light of these considerations, we believe that the tort of conversion must keep pace with the contemporary realities of widespread computer use. We therefore answer the certified question in the affirmative and hold that the type of data that Nationwide allegedly took possession of—electronic records that were stored on a computer and were indistinguishable from

printed documents—is subject to a claim of conversion in New York. Because this is the only type of intangible property at issue in this case, we do not consider whether any of the myriad other forms of virtual information should be protected by the tort.

Accordingly, the certified question should be answered in the affirmative.

Chief Judge KAYE and Judges CIPARICK, READ, SMITH, PIGOTT and JONES concur.

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the affirmative.