Addison Whitney, LLC v. Cashion, 2017 NCBC 50.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

ADDISON WHITNEY, LLC,

          Plaintiff,

v.

BRANNON CASHION; VINCENT
BUDD; RANDALL SCOTT;
ANDREW CUYKENDALL; AMY
BAYNARD; and JENNIFER
RODDEN,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 1956

**ORDER AND OPINION
ON DEFENDANTS' PARTIAL
MOTION TO DISMISS**

1. This case arises from the mass resignation of six officers and employees of Plaintiff Addison Whitney, LLC. According to Addison Whitney, Defendants conspired to resign for the purpose of starting a competing business, thereby breaching their contractual and fiduciary duties to the company. Addison Whitney further alleges that Defendants misappropriated the company's trade secrets and wrongfully obtained other confidential information and documents.

2. Defendants moved to dismiss three asserted claims pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. Defendants contend that they did not owe a fiduciary duty to Addison Whitney, that certain contractual obligations are unenforceable, and that they did not deprive Addison Whitney of the use of electronic documents allegedly taken around the time of their resignations.

3. Having considered the motion to dismiss; the briefs supporting and opposing the motion; and the parties' arguments at the hearing on May 23, 2017, the Court **GRANTS in part** and **DENIES in part** the motion to dismiss.

*Littler Mendelson, P.C., by Michael Scott McDonald, Stephen D. Dellinger, and Elise Hofer McKelvey, for Plaintiff.*

*Van Hoy, Reutlinger, Adams & Dunn, PLLC, by G. Bryan Adams, III, for Defendants.*

Conrad, Judge.

I.
BACKGROUND

4. The Court does not make findings of fact on a Rule 12(b)(6) motion to dismiss. The following factual summary is drawn from relevant allegations in the amended complaint and attached exhibits.[1]

5. Addison Whitney, a North Carolina company, "specializes in verbal branding, visual branding, brand strategy, and research and analysis." (Am. Compl. ¶ 14.) The company often assists pharmaceutical companies in creating brand names that the appropriate regulatory authority will approve. (Am. Compl. ¶¶ 15–17.)

6. Addison Whitney is a wholly owned subsidiary of inVentiv Health, Inc. ("inVentiv"). (Am. Compl. ¶ 14.) inVentiv acquired Addison Whitney's predecessor—Addison Whitney, Inc.—on June 1, 2007 via an asset purchase. (Am. Compl. ¶ 28.) At that time, inVentiv dissolved Addison Whitney, Inc. and created Addison Whitney, LLC as the successor. (Am. Compl. ¶ 28.) Although primarily based in Charlotte,

---

[1] The amended complaint incorporates by reference several affidavits. (*See* Am. Compl. ¶¶ 2–3.) Among the federal courts of appeals, there appears to be a split regarding whether and when it is appropriate to consider affidavits as part of a complaint. *Compare Smith v. Hogan*, 794 F.3d 249, 254 (2d Cir. 2015), *with N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 453 & n.4 (7th Cir. 1998). The Court is unaware of any North Carolina precedent on point. It is unnecessary to address this issue because Defendants have not objected to consideration of the affidavits, and the affidavits are not necessary to the decision.

North Carolina, Addison Whitney has a global footprint with small offices overseas. (*See* Am. Compl. ¶ 4; *see also* Am. Compl., Stockman Aff. ¶ 5.)

7. Defendants Brannon Cashion, Vincent Budd, Randall Scott, Andrew Cuykendall, Amy Baynard, and Jennifer Rodden are former officers and employees of Addison Whitney, all of whom resided in the company's Charlotte office. (Am. Compl. ¶¶ 28–33, 89.) Defendants tendered their resignations on the morning of January 21, 2017, and they are now forming a business to compete with Addison Whitney. (Am. Compl. ¶¶ 89–92.) At the time of their resignations, Cashion was Addison Whitney's Global President; Budd and Scott were Senior Vice Presidents; Cuykendall and Baynard were Vice Presidents; and Rodden was a Senior Project Manager. (Am. Comp. ¶¶ 28–33.)

8. Addison Whitney alleges that Defendants began formulating their plan to leave the company and create a competing business as early as the summer of 2016. (*See* Am. Compl. ¶¶ 58, 66.) During the third and fourth quarters of 2016, Addison Whitney's performance suffered, resulting in a revenue shortfall of several million dollars. (Am. Compl. ¶ 62.) Addison Whitney attributes its poor performance to Defendants, accusing them of lapses in client services and purposely reducing their business development efforts on behalf of the company. (Am. Compl. ¶ 65.)

9. Addison Whitney also alleges that, in the weeks leading up to their resignations, Defendants took steps to set up "an immediate pipeline" of business for their new enterprise. (Am. Compl. ¶ 61.) Defendants had access to trade secrets and other confidential information, including customer information and details on open

business opportunities, as part of their employment. (*See* Am. Compl. ¶ 36.) Addison Whitney believes Defendants accessed this information prior to resigning without a business reason for doing so and then retained the information with the intent to gain a competitive advantage. (*See, e.g.*, Am. Compl. ¶¶ 58, 73, 80, 108–10, 127, 169–74.)

10. Defendants' "departure from Addison Whitney has had a sudden and dramatic negative impact on Addison Whitney's financial condition." (Am. Compl., Stockman Aff. ¶ 13.) The company's "project-based business . . . requires constant business development efforts to drive a steady stream of sales." (Am. Comp. ¶ 34.) The Charlotte office was responsible for most of the company's revenues, and Defendants represent nearly all of the company's management as well as the bulk of its business development expertise. (*See* Am. Compl. ¶ 1; *see also* Am. Compl., 2d Kempf Aff. ¶¶ 3, 4.)

11. Addison Whitney filed this action on January 30, 2017. Its amended complaint asserts seven causes of action: a claim for breach of fiduciary duty against all Defendants except Rodden; and claims against all Defendants for misappropriation of trade secrets, unfair or deceptive trade practices, breach of contract, conversion, civil conspiracy, and computer trespass. As relevant here, the claim for breach of contract concerns an Employee Confidentiality and Non-Compete Agreement ("Confidentiality Agreement"), which was signed by all Defendants except Baynard. (*See* Am. Compl. ¶ 42.) The Confidentiality Agreement contains a confidentiality and non-disclosure provision as well as a provision that requires employees not to "directly or indirectly hire, solicit or encourage or induce any

employee" to leave Addison Whitney during the period of employment and for one year following termination. (*See* Am. Compl. ¶¶ 42, 44 (citing Exhibits F–J attached to Freeman-Greene Aff.).)

12. On February 9, 2017, Addison Whitney moved for a preliminary injunction. Addison Whitney sought to enjoin Defendants from using, disclosing, or otherwise misappropriating its confidential information and trade secrets; from soliciting or encouraging employees to leave the company; and from competing against Addison Whitney. The Court granted the motion with respect to misappropriation of trade secrets and confidential information but denied it in all other respects. *See generally Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 23 (N.C. Super. Ct. Mar. 15, 2017).

13. Defendants filed their motion to dismiss on April 3, 2017; Addison Whitney responded on April 21, 2017; and Defendants filed a reply on May 4, 2017. The motion has been fully briefed, and the Court held a hearing on May 23, 2017. The motion is ripe for determination.

## II.
## ANALYSIS

14. A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Concrete Serv. Corp. v. Investors Grp., Inc.*, 79 N.C. App. 678, 681, 340 S.E.2d 755, 758 (1986). The motion should be granted only "(1) when the complaint on its face reveals that no law supports plaintiff's claim; (2) when the complaint on its face reveals the absence of fact sufficient to make a good claim; [and] (3) when

some fact disclosed in the complaint necessarily defeats plaintiff's claim." *Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986).

15. In deciding a Rule 12(b)(6) motion, the Court must treat the well-pleaded allegations of the complaint as true and view the facts and permissible inferences "in the light most favorable to" the non-moving party. *Ford v. Peaches Entm't Corp.*, 83 N.C. App. 155, 156, 349 S.E.2d 82, 83 (1986); *see also Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970). "[T]he court is not required to accept as true any conclusions of law or unwarranted deductions of fact." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 56, 554 S.E.2d 840, 844 (2001). In addition, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers," without converting a Rule 12(b)(6) motion into a motion for summary judgment. *Weaver v. St. Joseph of the Pines, Inc.*, 187 N.C. App. 198, 204, 652 S.E.2d 701, 707 (2007) (quoting *Oberlin Capital*, 147 N.C. App. at 60, 554 S.E.2d at 847).

## A. Breach of Contract

16. Cashion, Budd, Cuykendall, and Scott move for partial dismissal of the claim for breach of contract. They assert that the Confidentiality Agreements are unenforceable due to a lack of consideration. (*See* Defs.' Mem. in Supp. of Partial Mot. to Dismiss 7–8 ["Defs.' Mem."].) Addison Whitney responds that the consideration for the Confidentiality Agreements "was these Defendants' new employment with Addison Whitney, LLC." (Pl.'s Mem. in Opp. to Defs.' Partial Mot. to Dismiss 15 ["Pl.'s Mem."].)

17. The Court has previously addressed this issue in the context of deciding Addison Whitney's motion for preliminary injunction. As the Court explained, "[a] contract, or 'any modification to an existing contract, must be supported by consideration.'" *Addison Whitney*, 2017 NCBC LEXIS 23, at *24 (quoting *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 17, at *46 (N.C. Super. Ct. Feb. 18, 2016)). For an employment agreement, such as a promise by the employee not to disclose the employer's confidential information, the employment relationship may serve as consideration when the employee makes the promise as part of the initial employment terms. On the other hand, if the employer and employee enter into the agreement after the creation of the employment relationship, the promise of continued at-will employment is inadequate consideration. *See RoundPoint Mortg.*, 2016 NCBC LEXIS 17, at *47–48; *Better Bus. Forms & Prods. v. Craver*, 2007 NCBC LEXIS 34, at *19 (N.C. Super. Ct. Nov. 1, 2007).

18. Here, the amended complaint expressly alleges that Cashion, Budd, Cuykendall, and Scott entered into the Confidentiality Agreements as "a condition of and in consideration for their employment with Addison Whitney, LLC." (Am. Compl. ¶ 42.) The Court must accept this allegation as true under the Rule 12(b)(6) standard, and ordinarily, that would end the matter at this stage.

19. Defendants, however, contend that Addison Whitney's timeline does not add up. Cashion, Scott, Budd, and Cuykendall began a new employment relationship with Addison Whitney in June 2007, following inVentiv's acquisition of the company's predecessor through an asset purchase (*see* Am Compl. ¶¶ 28, 42). *See, e.g., Am.*

*Propane, LP v. Coffey*, 2014 NCBC LEXIS 4, at \*10 (N.C. Super. Ct. Feb. 11, 2014) (holding that an asset purchase terminates existing employment relationships). These Defendants then signed the Confidentiality Agreements roughly 90 days later—Cashion on September 1; and Scott, Budd, and Cuykendall on September 17— at a time when they were already employed. (*See* Am. Compl., Freeman-Greene Aff. Exs. F–I.) This sequence, Defendants assert, renders the Confidentiality Agreements unenforceable as a matter of law because they "were not signed at the inception of employment." (Defs.' Mem. 7–8.)

20. The Court disagrees. The date the agreements were signed is relevant but, standing alone, does not defeat Addison Whitney's claim. As courts have noted, an employer and employee may agree to terms at the outset of an employment relationship and later reduce those terms to writing. In that circumstance, the employment relationship may serve as consideration for the agreement despite the absence of a contemporaneous signed writing. *See Young v. Mastrom, Inc.*, 99 N.C. App. 120, 123, 392 S.E.2d 446, 448 (1990); *see also Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 NCBC LEXIS 33, at \*15 (N.C. Super. Ct. Oct. 19, 2007) ("It is immaterial that the written covenant is executed after the employee starts to work, so long as the terms incorporated therein were agreed upon at the time of employment.").

21. To prevail on its claim, Addison Whitney will need to demonstrate that the Confidentiality Agreements memorialize an agreement made at the time of the new employment relationship, but it does not need to prove its case at this stage. Nor is

the Court bound by its conclusion, in deciding the motion for preliminary injunction, that Addison Whitney had not shown a likelihood of success on the point. For purposes of Rule 12(b)(6) and crediting the allegations of the amended complaint, the Court concludes that Addison Whitney has alleged sufficient facts to show that the Confidentiality Agreements are supported by valid consideration.

22.     Finally, Defendant Rodden separately argues that a non-compete clause in her Confidentiality Agreement is unenforceable. (Defs.' Mem. 8.) The Court does not need to address this argument because Addison Whitney has represented that the "First Amended Complaint contains no claim against Defendant Rodden for breaching her non-competition covenant." (Pl.'s Mem. 16.)

23.     For these reasons, the Court denies the partial motion to dismiss the claim for breach of contract.

## B. Breach of Fiduciary Duty

24.     Addison Whitney asserts a claim for breach of fiduciary duty against Cashion, Budd, Scott, Cuykendall, and Baynard. These Defendants argue that the complaint does not sufficiently allege the existence of a fiduciary relationship and move to dismiss the claim on that ground.

25.     "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). North Carolina courts have identified two types of fiduciary relationships. The first type "arise[s] from 'legal relations'"—*e.g.*, attorney and client, partners, principal and agent, and similar relationships. *S.N.R. Mgmt. Corp. v.*

*Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008) (quoting *Rhone-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d 540, 546 (M.D.N.C. 1999)). The second includes relationships "that exist 'as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other.'" *Id.*

26. The premise of Defendants' argument is that they were merely employees of Addison Whitney. (*See* Defs.' Mem. 3.) If that were true, the law would place Defendants on a strong footing. Employer-employee relationships are typically not the kind of legal relations that give rise to fiduciary duties. *See Dalton*, 353 N.C. at 652, 548 S.E.2d at 708. And the standard for showing a *de facto* fiduciary relationship—through superiority and influence by the employee over its employer— "is a demanding one." *Lockerman v. S. River Elec. Membership Corp.*, 794 S.E.2d 346, 352 (N.C. Ct. App. 2016); *see also Broussard v. Meineke Discount Muffler Shops., Inc.*, 155 F.3d 331, 348 (4th Cir. 1998) ("Only when one party figuratively holds all the cards – all the financial power or technical information, for example – have North Carolina courts found that the 'special circumstance' of a fiduciary relationship has arisen.").

27. As Addison Whitney correctly observes, however, the amended complaint alleges that these five Defendants were *officers*, not *employees*. (*See* Pl.'s Mem. 1, 2, 5–7.) Cashion was Addison Whitney's Global President, and he "is listed in Addison Whitney's organizational records as an officer." (Am. Compl. ¶ 28; *see also* Am. Compl., Moore Aff. ¶¶ 3, 7, Ex. B.) At the time of their resignations, Budd and Scott

were Senior Vice Presidents, and Cuykendall and Baynard were Vice Presidents. (Am. Compl. ¶¶ 29–32, 138–42.)

28. These allegations sufficiently plead the existence of a fiduciary relationship "by virtue of" each Defendant's position at the company. (Am. Compl. ¶¶ 138–42.) The North Carolina Limited Liability Company Act expressly requires managers and "company officials who are not managers" to discharge their duties "(i) in good faith, (ii) with the care an ordinary prudent person in a like position would exercise under similar circumstances, and (iii) subject to the operating agreement, in a manner the manager [or company official] believes to be in the best interests of the LLC." N.C. Gen. Stat. §§ 57D-3-21(b), 57D-3-23.[2] "Company official" is defined as "[a]ny person exercising any management authority over the limited liability company whether the person is a manager or referred to as a manager, director, or officer or given any other title." N.C. Gen. Stat. § 57D-1-03(5).

29. Defendants try to sidestep the statute by arguing that they were only nominally officers—mere managers with no control over affairs of "operational significance." (Defs.' Mem. 5.) But the Court is not in a position at the pleading stage to evaluate whether Defendants held "only a title and not an actual office," much less render such a conclusion as a matter of law. *Morris v. Scenera Research LLC*, 2012 NCBC LEXIS 1, at *31 (N.C. Super. Ct. Jan. 4, 2012); *see also Computer Design & Integration, LLC v. Brown*, 2016 NCBC LEXIS 96, at *11–12 (N.C. Super. Ct. Dec. 6, 2016) (denying motion to dismiss where president, as a company official, owed a

---

[2] Chapter 57D applies to Addison Whitney even though it was created in 2007. *See* N.C. Gen. Stat. § 57D-1-02(c).

fiduciary duty under section 57D-3-21); *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2002 NCBC LEXIS 2, at \*17 (N.C. Super. Ct. July 10, 2002) (denying summary judgment and noting that, "[b]y virtue of their titles alone," the defendants likely "held jobs of significant responsibility").

30. Taken as true, the amended complaint provides ample support for Addison Whitney's view that these five Defendants "set Addison Whitney's strategic course and controlled its business development." (Pl.'s Mem. 4.) Cashion, for example, had responsibility "for overseeing the overall operational, business development, and project delivery functions of Addison Whitney." (Am. Compl. ¶ 28.) The others performed lesser duties consistent with each individual's place in the hierarchy. (*See* Am. Compl. ¶¶ 29–32.) Collectively, these individuals comprised the entirety of Addison Whitney's senior management (save one Vice President who did not resign), and their departures left the company in a difficult position. (*See* Am Compl. ¶ 1.)

31. The Court is unaware of any case dismissing a breach of fiduciary duty claim against individuals with similar titles and authority at the 12(b)(6) stage. In every case cited by Defendants, the employee held a non-officer position. *See Dalton*, 353 N.C. at 652, 548 S.E.2d at 708 ("production manager for a division of employer Dalton's publishing business"); *Austin Maint. & Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 409, 742 S.E.2d 535, 541 (2012) ("foreman" of construction crew); *Artistic S. Inc. v. Lund*, 2015 NCBC LEXIS 113, at \*5 (N.C. Super. Ct. Dec. 9, 2015) ("outside sales representative"); *DSM Dyneema, LLC v. Thagard*, 2015 NCBC LEXIS 50, at \*21 (N.C. Super. Ct. May 12, 2015) ("Application Manager – Life Protection");

*Allegis Grp., Inc. v. Zachary Piper, LLC*, 2013 NCBC LEXIS 12, at *7 (N.C. Super. Ct. Feb. 25, 2013) ("National Account Manager" and "Director of Strategic Sales for Government Services").

32. The Court has considered Defendants' remaining arguments and finds them unpersuasive. Defendants contend, for example, that the Court should disregard exhibits identifying Cashion as an officer and manager of the company because they are "inherently unreliable" and "fraught with mistakes." (Defs.' Reply 9.) Having reviewed the amended complaint and incorporated materials, the Court concludes that any discrepancies go to the weight and credibility of the evidence, which may not be resolved at the Rule 12 stage.

33. Viewing the complaint in the light most favorable to Addison Whitney as the non-moving party, the allegations suffice to state a claim for breach of fiduciary duty. The Court denies the motion to dismiss the claim.

## C. Conversion

34. Addison Whitney asserts Defendants wrongfully copied or deleted numerous electronic documents and other electronically stored information prior to resigning. (*See* Pl.'s Mem. 17.) Defendants argue that Addison Whitney "does not allege that any of the Defendants actually deprived Plaintiff of the use of the property at issue." (Defs.' Mem. 10.)

35. Conversion is a tort with deep roots in the common law. It "is defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the

exclusion of an owner's rights.'" *Spinks v. Taylor*, 303 N.C. 256, 264–65, 278 S.E.2d 501, 506 (1981) (quoting *Peed v. Burleson, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956)). "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner." *Bartlett Milling Co. v. Walnut Grove Auction & Realty Co.*, 192 N.C. App. 74, 86, 665 S.E.2d 478, 488 (2008).

36. These principles were not designed with the bits and bytes of the Information Age in mind. As another Member of this Court noted, it is unclear whether electronic documents are "goods" or "personal property" (which may be subject to a conversion claim) or instead are "intangible interests such as business opportunities and expectancy interests" (which are not subject to a conversion claim). *HCW Ret. & Fin. Servs., LLC v. HCW Emp. Benefit Servs., LLC*, 2015 NCBC LEXIS 73, at *59–60 (N.C. Super. Ct. July 14, 2015) (quoting *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 414, 537 S.E.2d 248, 264 (2000) (emphasis omitted)).

37. The better view, and the weight of authority, treats electronic documents as personal property subject to a claim for conversion. It would make little sense to foreclose recovery for the wrongful deprivation of electronic information "when taking the same information printed into hard copy form would be sufficient." *HCW*, 2015 NCBC LEXIS 73, at *61. This is consistent with appellate precedent permitting an action for conversion of "proprietary information, including customer lists, contact lists, records and historical data." *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 331, 572 S.E.2d 200, 207 (2002). It is also consistent with case law in other

jurisdictions, which reveals a growing recognition "that the tort of conversion must keep pace with the contemporary realities of widespread computer use." *Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y. 3d 283, 292 (N.Y. 2007) (applying New York law).

38. The more difficult question is what action constitutes a *conversion* of computerized information. Electronic documents are easy to copy at the stroke of a key or click of a button, and storage media are abundant, varied, and relatively inexpensive. Businesses and individuals routinely store copies of files remotely on servers or in the cloud—instant redundancy that greatly minimizes the risk of losing valuable information due to either misfortune or malfeasance. In other words, a thief may steal a copy, but the information itself is hard to destroy.

39. By the same token, conversion of electronically stored information is hard to prove. A growing body of case law from this Court has held that "making a copy of electronically-stored information which does not deprive the plaintiff of possession or use of information, does not support a claim for conversion." *RCJJ, LLC v. RCWIL Enters., LLC*, 2016 NCBC LEXIS 46, at \*53 (N.C. Super. Ct. June 20, 2016); *see also RoundPoint Mortg*, 2016 NCBC LEXIS 17, at \*55 (dismissing conversion claim where plaintiff did "not allege that Defendants copied and then deleted the information so as to deprive [plaintiff] from its continued use of the information"); *Horner Int'l Co. v. McKoy*, 2014 NCBC LEXIS 68, at \*8 (N.C. Super. Ct. Dec. 18, 2014) (dismissing conversion claim where plaintiff did "not allege it was deprived of the information or excluded from use of the information allegedly converted by Defendant").

40. Addison Whitney does not cite or discuss these cases. Instead, it relies on a federal court decision for the proposition that copying electronic documents is a conversion when it deprives the owner "of the sole and exclusive dominion and control over its trade secrets and confidential information," even when the owner maintains possession of the information. (Pl.'s Mem. 19 (citing *Bridgetree, Inc. v. Red F. Mktg., LLC*, No. 3:10-cv-00228-FDW-DSC, 2013 U.S. Dist. LEXIS 15372, at *47–51 (W.D.N.C. Feb. 5, 2013) (applying North Carolina law)).) The court in *Bridgetree* noted that it was "unaware of any North Carolina case that holds that taking a copy of an electronic file cannot constitute conversion." 2013 U.S. Dist. LEXIS 15372, at *49–50.

41. This Court adheres to the reasoning of *RCJJ*, *Roundpoint*, and *Horner*, all of which were decided after *Bridgetree*. North Carolina courts have repeatedly held that the essence of a conversion claim is *deprivation* to the owner. *E.g.*, *Bartlett Milling Co.*, 192 N.C. App. at 86, 665 S.E.2d at 488; *Lake Mary L.P. v. Johnston*, 145 N.C. App. 525, 532, 551 S.E.2d 546, 552 (2001); *Marina Food Assoc., Inc. v. Marina Rest., Inc.*, 100 N.C. App. 82, 93, 394 S.E.2d 824, 831 (1990). In the absence of further guidance from the North Carolina Supreme Court or Court of Appeals, the Court declines to construe the law of conversion more broadly.

42. Moreover, although the Court has not discovered any North Carolina precedent on the point, it appears that the acquisition of paper photocopies does not ordinarily give rise to a conversion claim where the owner retained the original. *See, e.g.*, *FMC Corp. v. Capital Cities/ABC, Inc.*, 915 F.2d 300, 303–04 (7th Cir. 1990)

(applying California law). The Court sees no reason that businesses operating in a paperless environment should be placed in a more favorable legal position than businesses that store documents the old fashioned way.

43. Applying these principles to the allegations of the amended complaint, the Court grants Defendants' motion in part but denies it in certain respects. The bulk of Addison Whitney's allegations concern Defendants' copying of electronic files— various templates and guidelines, a database allegedly subject to trade secret protection, and other unspecified documents. (*See* Am. Compl. ¶¶ 167–76.) Addison Whitney has not alleged that Defendants deprived it of possession or access to this information. Rather, Addison Whitney concedes that many of its allegations "relate to documents it still has in its possession." (Pl.'s Mem. 17.) Such allegations are insufficient to state a claim for conversion.

44. On the other hand, Addison Whitney also contends that Budd and Rodden deleted numerous documents from company-issued laptops and associated servers. (Pl.'s Mem. 17; Am. Compl. ¶¶ 184(c), 184(gg).) Although these allegations appear outside the section of the amended complaint stating the claim for conversion, Defendants have not raised any notice concerns. The Court therefore considers the allegations as part of the conversion claim and concludes that deletion of documents may pose a deprivation to the owner sufficient to give rise to a conversion claim. *See, e.g., Thyroff*, 8 N.Y. 3d at 292 ("Similarly, electronic documents and records stored on a computer can also be converted by simply pressing the delete button.").

45. Defendants assert that Addison Whitney may be able to recover the information from back-up tapes or, for at least some documents, by examining the computer's "recycle bin." (*See* Defs.' Reply 11–12.) These are reasonable questions, but they should be raised in discovery or on summary judgment or both. It is unclear on the face of the complaint whether and to what extent Addison Whitney may restore its deleted data.

46. Finally, the Court notes that Addison Whitney also alleges that Defendants removed physical property on the day of their resignations. (*See* Am. Compl. ¶ 88.) The amended complaint does not identify this property in any meaningful way, and the Court concludes that such speculative, conclusory allegations are insufficient to state a claim for relief. *See, e.g., Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005).

47. Because the claims against Cashion, Scott, Cuykendall, and Baynard depend exclusively on allegations of copying, the Court grants the motion to dismiss the claim for conversion against them. The Court denies the motion with respect to Budd and Rodden in light of the allegations that they deleted documents.

### III.
### CONCLUSION

48. For all these reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Rule 12(b)(6) motion as follows:

    a. The Court denies the motion for partial dismissal of the claim for breach of contract.

b.     The Court denies the motion to dismiss the claim for breach of fiduciary duty.

c.     The Court grants the motion to dismiss the claim for conversion as to Cashion, Scott, Cuykendall, and Baynard.  The Court denies the motion as to Budd and Rodden.

This the 9th day of June, 2017.


                                         /s/ Adam M. Conrad
                                         Adam M. Conrad
                                         Special Superior Court Judge
                                          for Complex Business Cases